IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NICOLE SANDERS,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>CITY AND COUNTY OF HONOLULU, *et al.*,<br><br>　　　　Defendants. | Case No. 20-cv-495-DKW-KJM<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

  Plaintiff Nicole Sanders alleges that Defendant City and County of Honolulu (the "City") discriminated against her on the basis of gender by failing to hire her as a Honolulu Police Department (HPD) Metropolitan Police Recruit in 2019. Dkt. No. 35, Third Amended Complaint ("TAC"); 42 U.S.C. § 2000e-2(a)(1). The City now moves for summary judgment claiming that (i) Sanders has not established a *prima facie* case of discriminatory failure-to-hire under Title VII, and/or (ii) HPD had a legitimate, nondiscriminatory, non-pretextual reason for its failure-to-hire.

  The Court agrees with the City. Sanders cannot establish a *prima facie* case of failure-to-hire because she was not qualified for the position of HPD police recruit. To be considered qualified, a candidate must disclose in an application questionnaire all past criminal activity, including acts that previously went undetected. It is undisputed that Sanders failed to disclose certain undetected acts

1

on her questionnaire, which were exposed later in the application process—principally, her involvement in the bribery of a government official in Turkmenistan, allowing her minor son to escape alleged abuse by her ex-husband and emigrate to the United States. In accordance with HPD policy, the hiring panel found Sanders to be unqualified for the recruit position due to her non-disclosures.

Having been rendered unqualified for the position she sought, Sanders cannot establish a *prima facie* case of discrimination, entitling the City to summary judgment.

## LEGAL STANDARD

### I. Motion for Summary Judgment

Under Fed. R. Civ. P. 56(a), a court must grant a motion for summary judgment when, considering the record in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

On summary judgment, it is each party's responsibility to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of

informing the court of the basis for its motion, identifying the portion of the record "it believes demonstrate[s] the absence of a genuine issue of material fact," and "affirmatively demonstrat[ing] that no reasonable trier of fact could find for other than the moving party" on any of the elements essential to its case. *Id.*; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant succeeds, the burden then shifts to the non-movant to present significant, probative evidence demonstrating the existence of a triable issue of fact as to the movant's claim or any affirmative defense that it may have. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Soremekun*, 509 F.3d at 984.

## II.   Title VII Failure-to-Hire Claim

Section 2000e-2 of Title 42 of the U.S. Code ("Title VII") provides:

It shall be unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

A claim of discriminatory failure-to-hire in violation of Title VII is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell-Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing that (i) she belongs to a protected class; (ii) she applied for *and was qualified for* a job for which the employer was seeking applicants; (iii) "despite [her] qualifications," she was not hired; and (iv) after her rejection, the employer continued to seek applicants with her same qualifications. *Id.* at 802 (emphasis added). If she establishes a *prima facie* case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the failure-to-hire. *Id.* If the employer succeeds, the burden shifts back to the plaintiff to prove that the employer's articulated reason is pretextual. *Id.* at 804.

### RELEVANT UNDISPUTED MATERIAL FACTS AND PROCEDURAL BACKGROUND

On September 10, 2018, Sanders filled out an online application to become an HPD Metropolitan Police Recruit. Declaration of Nicole Sanders ("Sanders Decl.") ¶ 4, Dkt. No. 68-1. She passed a written test on October 13, 2018, and otherwise met or possessed the objective requirements, including a high school diploma and driver's license. *Id.*

On January 19, 2019, pursuant to the online application, Sanders also filled out a personal history statement (PHS). Defendant's Concise Statement of Facts

("DCSF") ¶¶ 1–2, Dkt. No. 63; Plaintiff's Response to Defendant's Concise Statement of Facts ("PRDCSF") ¶¶ 1–2, Dkt. No. 69.  The PHS instructed candidates to think back through their "entire li[ves]" and disclose any criminal acts, including those that were "undetected acts"—acts committed but for which the candidate was not caught.  DCSF ¶5; PRDCSF ¶ 5; Declaration of Aaron Takasaki-Young ("Takasaki-Young Decl.") ¶¶ 6–9, 11, Dkt. No. 62-2.  Transparency and comprehensiveness were paramount.  The PHS advised candidates, "[F]ailure to disclose undetected acts . . . , *criminal involvement or background information*; minimizing facts and circumstances, or providing false information on your PHS *will result in your dis[q]ualification*."  Dkt. No. 62-6 at 3, 7 (emphasis added).  HPD's website also stated:

> Any material misstatement of fact or significant admission during the application or background process shall be disqualifying, including inconsistent statements made during the initial background interview or polygraph examination or discrepancies between this background investigation and other investigations conducted by other law enforcement agencies.

Takasaki-Young Decl. ¶ 11.[1]

    Sanders read and understood these instructions.  DCSF ¶¶ 3–5; PRDCSF ¶¶ 3–5; Deposition of Nicole Sanders ("Sanders Dep.") at 35:17–36:8, Dkt. No.

---

[1] According to HPD's selection committee, "Any disclosures of potential crimes . . . made after the online application is submitted are considered untruthful, and will lead to disqualification of a candidate."  Takasaki-Young Decl. ¶ 13.

62-5. She also signed the following statement on her PHS: "I agree and understand that any misstatements or omissions of material facts may cause forfeiture on my part of all rights to any employment in the service of the City and County of Honolulu."  Dkt. No. 62-6 at 2.

Sanders answered "no" on her PHS when asked if she had ever committed any crimes that amounted to a misdemeanor or felony and answered identically when asked if she had ever committed a forgery, including falsifying any type of document, check, certificate, or license.  DCSF ¶¶ 10–12; PRDCSF ¶¶ 10–12.

On April 8, 2019, Sgt. Glen Luecke from the HPD Human Resources Department sent an email to Sanders' 193-candidate pool, providing examples of commonly omitted undetected acts, and offering candidates an opportunity to "amend" their PHS accordingly.  Dkt. No. 68-4.  Luecke's examples included "Sibling fights" and "School fights."  *Id.*  Luecke explained that these sorts of omissions had recently caused "two out-of-state candidates go[ing] through the polygraph exam" to "struggle[] because they failed to disclose a few incidents," and stated, "I would hate to see anyone get disqualified because of a non-disclosure."  *Id.*  On April 11, 2019, Sanders replied to Luecke's email with a few supplemental disclosures of possible undetected acts from her past, including, for example, the fact that she had been sex trafficked by her abusive ex-husband in Turkmenistan.  *Id.*

Sanders met with success in the early phases of her police recruit candidacy. She passed a physical fitness exam, medical exam, psychological exam, and drug test, and she met with a psychiatrist. Sanders Dep. at 23:11–21; 24:15–26:6. On April 11, 2019, she received a Conditional Offer of Employment. Sanders Decl. ¶ 11; Takasaki-Young Decl. ¶ 17.

On May 2, 2019, now-retired HPD Detective Mitchell Chung administered a pre-polygraph interview and polygraph examination to Sanders.[2] Declaration of Mitchell Chung ("Chung Decl.") ¶¶ 1, 11, Dkt. No. 62-3. Sanders alleges that Chung sexually harassed her during the six-hour interview. More specifically, she claims:

- At the beginning of the interview, Chung told Sanders he "understood why [she] was divorced three times as [she] was beautiful," asked if she liked Hawaiʻian guys," and asked if she "had ever cheated on [her] husband." TAC at 2; Sanders Decl. ¶¶ 16, 17.

- Later, Chung "accused [her] of being a prostitute" because she revealed that her husband had sex trafficked her to his peers in Turkmenistan. *Id.* When Sanders responded, "I'm not a prostitute. . . . As far as I understand, that was abuse," Chung responded, "But he prostituted you, which means that you're a prostitute." Sanders Dep. 31:21–25.

- Chung "wanted to know the specific number of men that had raped [Sanders], asked [her] if there were a few men at the same time of the rape, and [asked] whether those sexual acts were 'anal, oral, or vaginal sex.'" Sanders Decl. ¶ 17.

---

[2]All HPD recruit applicants undergo a polygraph examination and a pre-polygraph interview with an HPD officer. Takasaki-Young Decl. ¶ 15.

- Sanders "felt uncomfortable by the sexual questions . . . and would have felt more comfortable if a female officer was allowed to be present during the interview." *Id.* ¶ 18.

- Chung also expressed unexplained skepticism and negativity about Sanders' ability to be accepted as a recruit. He asked "how [she] planned on being a police officer while [she] had a disabled child." TAC at 3. He also told Sanders that she had failed her first polygraph exam because she had "used drugs," and when she told him that was impossible and demanded a second polygraph against his objections, he said, "FBI created studies about liars. If we found out that you're lying, it's going to be so bad in your case." Sanders Dep. 30:1–20. After she passed the second polygraph exam, he told her, "It doesn't mean that you will pass the medical." *Id.* When she told him she had already passed the medical exam, he said, "But that doesn't mean that you're going to pass [the] psychiatrist." *Id.*

After the pre-polygraph interview, Sanders asked the HPD Human Resources Department if her interview had been recorded. Sanders Decl. ¶ 20. She was informed that "all polygraph examinations [a]re regularly recorded for legal purposes," but "no recordings were made of [her] polygraph." *Id.* ¶ 21.

Also during the pre-polygraph interview, Sanders disclosed three undetected acts for the first time.[3] DCSF ¶¶ 8–9; PRDCSF ¶¶ 8–9. First, as a school-age child in Turkmenistan, she engaged in physical altercations by defending herself from male bullies. DCSF ¶ 15; PRDCSF ¶ 15. Second, in 2004, she took 100 manat, the equivalent of $15, out of her then-husband's pants pocket without his knowledge to pay for her son's medication. DCSF ¶ 14; PRDCSF ¶ 14. Third, in

---

[3]Sanders disputes that these three events were "undetected" acts.

2008, she sent $3,000 to her mother in Turkmenistan in order to facilitate her son's escape from her abusive ex-husband. DCSF ¶¶ 15, 27; PRDCSF ¶¶ 15, 27. Sanders concedes that when sent the money, she was not aware of precisely how it would be used, but knew that "in Turkmenistan, there is an unspoken rule that officials must be bribed." DCSF ¶ 28; PRDCSF ¶¶ 8, 28; *see also* Sanders Dep. at 45:25–46:5 ("[E]verything is only paid off in Turkmenistan. You cannot do anything without paying to anyone. Does not matter if everything is correct legally . . . ."). Later that year, Sanders traveled to Moscow to retrieve her son. Sanders Decl. ¶ 20. While there, Sanders learned that her mother had used the $3,000 to bribe a corrupt notary to notarize a fraudulent document containing her ex-husband's forged signature, authorizing her son to leave Turkmenistan. *Id.* ¶¶ 22, 24; DCSF ¶¶ 30, 37; PRDCSF ¶¶ 30, 37.

After the pre-polygraph interview, Sanders documented these events in writing at Chung's behest. Sanders wrote:

> Assault: When I grew up in Turkmenistan, I was bullied a lot by boys. I always tried to defend myself and that's why I fought with them. . . . Police was never involved and no one was injured. I used to punch[] them in the arm or kicked them in the butt. . . .
>
> Theft: 2004 or February around 12 am. . . . I stole money from my husband's pocket while he was drunk asleep. . . .
>
> Falsified ID – Forgery: . . . [My stepdaughter] was able to take a passport from [my ex-husband] and gave the passport to my mom. My mom gave the passport to the corrupted notary official and paid 3,000$ that I sent to her in order for him to falsify Albert's (my

9

> husband) permission for leaving the country for my (our) 5.5 years old son. . . .  My husband didn't know that our child left the country. . . . This is the only time when I falsified the document.

Dkt. No. 62-7.  Sanders now disavows these admissions, claiming they were coerced and/or dictated by Chung,[4] who had abused his power and confused her as to the nature of certain crimes, *e.g.*, by calling her a prostitute for being sex trafficked.  However, she does not dispute that the events took place as described.  Sanders Dep. 43:13–44:19, 45:3–12; Sanders Decl. ¶¶ 23, 26.

> On May 13, 2019, Sanders received an email from Sgt. Luecke, stating:
>
> I am a little disappointed that issues were discovered during you[r] polygraph examination.  I am glad that you disclosed them, but it is concerning.  The reason *why* you did things is less of a concern because I know you were doing it for the safety of your son and yourself. . . .  The ASSAULT and THEFT disclosures are not a big issue.  The FORGERY disclosure is a concern for two big reasons.  Falsification of an official government issued document, and child custody.  I am putting together a summary to present to the Selection Committee.  We'll have to wait for their decision.

Dkt. No. 68-4.  The same day, Sanders replied, explaining that she had not intentionally omitted the forgery event:

> I understand your concern.  The forgery was for the safety of my child and myself.  I didn't say about that because I didn't think that it's a Forgery since I only sent money and not even paid them by myself.  It was a different world and rules and law there didn't work and it also was 11 years ago.  I am sorry but I didn't try to hide anything from you, it didn't even come into my head at the time when I had a

---

[4]English is Sanders' second language.  Chung denies that he dictated the language in the admissions.  Chung Decl. ¶ 24 ("I did not tell Ms. Sanders what to write in her disclosures, other than to assist her when she asked for help with word choice.").

> clarification interview. I also didn't know that I was a prostitute when he sold me keeping knife by the throat of my child. That's why I didn't say anything to you at the interview, but I wrote to you later just because it came into my mind. I will wait for the decision.

*Id.* Sanders' candidacy packet, including Sgt. Luecke's summary report, was then forwarded to a three-member hiring panel, none of whom had interacted with Sanders prior to their decision on her candidacy. Takasaki-Young Decl. ¶¶ 2–4; PRDCSF ¶¶ 19–20, 22, 25–26.

On June 13, 2019, the HPD Background Section informed Sanders by letter that her admittance as a recruit was denied: "Based on disclosures, omissions, and/or inconsistencies found during the background investigation, the selection committee has determined that you are not suitable for the position at this time." Dkt. No. 62-10;[5] *see also* Takasaki-Young Decl. ¶ 18 ("The members of the panel determined that Ms. Sanders was not qualified to be hired as an HPD officer recruit because she did not disclose in her application that she had sent $3,000.00 to her mother in Turkmenistan, and that the money was used to have a document forged with Ms. Sanders' ex-husband's signature to remove her son from Turkmenistan."); Sanders Decl. ¶ 27 ("I was deemed unsuitable due to the false allegations by HPD that I omitted material information from my application . . . .").

---

[5] Sanders was first informed of her denial by telephone. She claims that the person on the phone call did not make clear the reason for the denial, stating, "I don't know the reason why the committee decided not to take you," and "[the hiring panel] took only the best from the best officers." Sanders Dep. 26:21–27:6.

Sanders was informed that she would be eligible to re-apply after June 1, 2022. Dkt. No. 62-10.

On June 17, 2019, Sanders sent an email requesting an administrative review of her denial from the hiring panel. Dkt. No. 7-1 at 1. In the email, she stated, "Though I may have been wrong to pay a corrupt notary, the law doesn't work fairly in Turkmenistan, and I needed to protect my child and myself from abusers." *Id.* The hiring panel did not reverse their decision.

In Sanders' 193-candidate group, four other individuals (all men) were also disqualified for non-disclosure of undetected acts. Dkt. No. 62-1 at 13. No candidate who omitted undetected acts on his or her PHS was hired. *Id.*

Chung was not a member of the hiring panel that reviewed Sanders' eligibility for the position of police recruit. *See* Takasaki-Young Decl. ¶ 19; Chung Decl. ¶ 25; Sanders Dep. 28:14–19.

On November 18, 2020, proceeding *pro se*, Sanders filed a Complaint against the City for employment discrimination. Dkt. No. 1. Following a series of motions to dismiss and amendments,[6] the current operative Third Amended Complaint ("TAC"), Dkt. No. 35, contains one remaining claim: discriminatory failure-to-hire on the basis of gender, in violation of Title VII. Sanders asserts that,

---

[6] *See, e.g.*, Orders granting in part Defendant's Motions to Dismiss. Dkt. Nos. 6, 21, 34.

despite being fully qualified for the position, she was not hired because she rejected Chung's sexual advances:

> Despite my over qualification for this position, I was still not hired. The reasons behind my not being hired were also not made clear. [D]uring my polygraph exam, I was subjected to . . . [sexual] harassment. . . . Detective Chung . . . asked me inappropriate questions regarding my sexual experiences in the past. Instead of concentrating on my qualification for the position and asking the appropriate questions, Detective Chung asked me very insensitive questions and made inappropriate comments which . . . made me feel uncomfortable . . . .

TAC at 2.

On April 27, 2022, the City filed the instant Motion for Summary Judgment (MSJ), explaining that, despite the allegations of harassment, Sanders could not establish a *prima facie* failure-to-hire claim because she was not qualified for the position due to her omission of material information from the PHS. Dkt. No. 62.

On June 27, 2022, Sanders opposed the MSJ. First, she argued that there was a genuine dispute of material fact as to whether she was untruthful in her application—*i.e.*, whether her omissions were intentional—because she did not recall the events until later, when the memories were triggered by Chung's probing questions at the pre-polygraph interview. Dkt. No. 67.[7] She explained, "I told

---

[7] Sanders claims to suffer from Battered Woman Syndrome and Post-Traumatic Stress Disorder. She asserts that these conditions caused her to temporarily suppress the details of the 2008 emigration of her son. *See* Dkt. No. 1 at 10.

HPD of all material information related to my past, and answered HPD's questions truthfully, exactly how it was asked." Sanders Decl. ¶ 27.

Second, she contended the three omitted incidents were not "undetected acts" at all, but "legal act[s]." Dkt. No. 67 at 8. With regard to the first two incidents, she asserted that "[j]uvenile spats hardly amount to a crime," and that she "did not 'steal' money from her abusive ex-husband[, but] had a right to take the $15. . . [because] . . . she was married to the abuser"). Dkt. No. 67 at 8 n.1, 9–10; *but see* Dkt. No. 68-4 (Sgt. Luecke email specifically informing candidates that "Sibling fights" and "School fights" should be reported). With regard to the forgery incident, she maintained that this was not a criminal act that needed to be reported because (i) she herself did not commit the bribery and forgery—her mother did; (ii) she did not know precisely what her mother was going to do with the $3,000 she sent; and (iii) even if she had, the acts were legally justifiable. Dkt. No. 67 at 6–9; Haw. Rev. Stat. §§ 708-850–853 (defining forgery); Haw. Rev. Stat. § 703-302(1) (defining the defense of necessity).

The City replied on July 22, 2022, emphasizing that applicants were required to self-report *all* criminal acts or involvement from their "entire li[ves]," with no "exception[] for defensible acts, or acts that the applicant may have been found not guilty of at trial." Dkt. No. 71 at 3–4.

The Court elected to decide the MSJ without a hearing pursuant to Local Rule 7.1(c), *see* Dkt. No. 72, and this Order follows.

## DISCUSSION

Sanders has established the first, third, and fourth elements of a *prima facie* case of discriminatory failure-to-hire. *See McDonnell Douglas*, 41 U.S. at 802. She is a woman who applied for the open position of HPD police recruit and was not hired, and, after her rejection, HPD continued to seek female applicants for the position.[8]

However, the City has carried its burden on summary judgment of showing the absence of a genuine issue of material fact that Sanders was not qualified for the position of police recruit because she omitted at least one criminal act[9] from her PHS, an omission that HPD regularly reminded applicants would result in disqualification. *See id.*; *Celotex*, 477 at 322; Dkt. No. 62-6 at 3, 7 ("[F]ailure to disclose undetected acts . . . or providing false information on your PHS will result in your dis[q]ualification."); Takasaki-Young Decl. ¶ 11 (HPD website requiring disclosure of any "criminal involvement or background information").

---

[8] The City concedes these three elements. Dkt. No. 62-1 at 5–6.
[9] This Order excludes discussion of the school fights and $15 theft because they are unnecessary to the analysis. *See* Takasaki-Young Decl. ¶ 18 (explaining that the hiring panel denied Sanders' candidacy because of the forgery omission, not the assault and theft omissions); Dkt. No. 68-4 (Sgt. Luecke stating that the assault and theft non-disclosures were "not a big issue").

15

Sanders' provision of $3,000 to her mother for the removal of Sanders' son from Turkmenistan through bribery and forgery should have been reported as an undetected act on her PHS. Under Haw. Rev. Stat. § 702-223, a person is liable as an accomplice to an offense when she knowingly or intentionally causes the commission of that offense. Though Sanders may not have known exactly how the money would be used by her mother when she sent it, she has repeatedly admitted that she knew it was standard operating procedure to bribe Turkmen government officials if you wanted anything to get done. *See e.g.*, PRDCSF ¶¶ 8, 28 ("[I]n Turkmenistan, there is an unspoken rule that officials must be bribed."); Sanders Dep. At 45:25–46:5 ("[E]verything is only paid off in Turkmenistan. You cannot do anything without paying to anyone.").

Moreover, even if she had not originally intended the $3,000 to be used for illicit purposes, she does not dispute that she learned the full details after the fact in the 2008 time frame, years before her application to HPD. Dkt. No. 67 at 7–8 ("Only after the money was sent to arrange for [Sanders'] son to come to the United States did [she] become aware that, to no great surprise knowing how things work in Turkmenistan, . . . [her] mother had bribed a notary . . . to create documents allowing [her] son to be freed."); *see also* PRDCSF ¶ 30. Thus, at the very least, Sanders was closely "involve[d]" with this crime and aware of it before seeking HPD employment. *See* Takasaki-Young Decl. ¶ 11.

16

Sanders contends her involvement in her son's surreptitious removal did not need to be reported on her HPD application because the crime was justifiable due to necessity. In other words, she claims her son was being abused by her ex-husband in Turkmenistan, justifying her actions. HPD's candidate instructions, however, make no exception for "justifiable" crimes. On the contrary, HPD consistently described its disclosure requirements as broadly as possible, explicitly requiring the disclosure of *any* criminal involvement, *see id.*, and requiring the disclosure of such seemingly minimal incidents as "School fights." *See* Dkt. No. 68-4; *see also* Dkt. No. 62-6 at 3, 7 (prohibiting all "material misstatement[s] of fact or significant admission[s]," even inadvertent ones).[10] HPD did not disqualify Sanders because she had committed a crime ten years prior; it disqualified her because she failed to adhere to HPD's disclosure requirements.[11]

Moreover, Sanders fully understood HPD's requirements. For example, when she received Sgt. Luecke's April 11, 2019 email allowing her an opportunity to amend her PHS—apparent amnesty, of sorts—Sanders replied with additional possible crimes, including that her husband had "sold [her] a few times for []

---

[10] Neither was it necessary that Sanders *know* her acts were criminal to trigger her disclosures, but the Court notes that Sanders *did* know it in this case. *See* DCSF ¶¶ 32–35; PRDCSF ¶¶ 32–35 (stating that Sanders was aware when she filled out the application that forgery, falsification of official documents, and bribery were crimes).

[11] It is unknown, for instance, whether Sanders' application would have proceeded if she had disclosed the forgery incident as part of her application before it was elicited during the polygraph phase.

money in order to buy himself alcohol and pay gambling debts . . . [while] he kept a knife by the throat of [her] 6 month son." Dkt. No. 68-4. But Luecke's message still did not prompt revelation of her forgery and role in her son's emigration.[12] And though Sanders may not have intended to deceive the hiring panel when she omitted these events, her intention was immaterial. HPD's hiring policies were clear, and they were uniformly applied. *See* Dkt. No. 62-1 at 13–14 (all four of Sanders' colleagues who failed to disclose undetected acts were deemed unqualified and removed from further consideration).

Finally, the harassment Sanders claims to have endured at the hands of Detective Chung does not absolve or excuse Sanders from having omitted these undetected acts from her application. *See* Dkt. No. 34 at 4–5 (Order explaining that sexual harassment during the hiring process does not create a viable "hostile work environment" cause of action under Title VII).[13] Nor does it prevent HPD

---

[12]Sanders has implicitly admitted that she knew these were activities the HPD expected her to report. In her initial Complaint, she explained that she would have reported these events if she had remembered them. *See* Dkt. No. 1 at 7–9. And, in her request for administrative review of her denial from the hiring panel on June 17, 2019, she wrote, "Though I may have been wrong to pay a corrupt notary, the law doesn't work fairly in Turkmenistan, and I needed to protect my child and myself from abusers." Dkt. No. 7-1 at 1.

[13]Further, Sanders has offered no evidence that Chung was a decision-maker or had any influence at all in the ultimate decision of the hiring panel, beyond facilitating the discovery of the undetected acts during the pre-polygraph interview. *See Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003) (explaining that there must be a sufficient nexus between the sexual harassment and the subsequent employment decision or decision-maker). The hiring panel, which did not include Chung, relied on Sanders' own handwritten admissions of non-disclosure when it denied her application. *See* Dkt. No. 62-7.

from relying on these omissions as grounds for her disqualification as a police recruit.

## **CONCLUSION**

Because there is no genuine dispute of material fact that Sanders was not qualified for the position of HPD police recruit, she is unable to establish a *prima facie* claim of sex discrimination under *McDonnell-Douglas*. Thus, the City's Motion for Summary Judgment, Dkt. No. 56, is GRANTED. The Clerk is instructed to CLOSE this case.

IT IS SO ORDERED.

DATED: September 28, 2022 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

_Nicole Sanders v. City and County of Honolulu, et al_; Civil No. 20-00495 DKW-KJM; **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**